J-S51028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROBERT W. KORTMAN | |
| Appellant | No. 40 MDA 2014 |

Appeal from the Judgment of Sentence December 5, 2013
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0001970-2013

BEFORE:  BOWES, J., OTT, J., and MUSMANNO, J.

CONCURRING AND DISSENTING MEMORANDUM BY OTT, J.:

**FILED MAY 14, 2015**

While I agree with the Majority that Kortman's conviction on the charges of harassment and disorderly conduct must be reversed, I believe that viewing the evidence in the light most favorable to the Commonwealth as verdict winner, Kortman's convictions of the charges of recklessly endangering another person and resisting arrest should be affirmed. Accordingly, I am compelled to concur in part and dissent in part to the Majority Memorandum.

The following evidence was produced at trial.

On April 19, 2012, at approximately 6:30 p.m., Kortman was parked in the West Reading Borough parking lot. Kortman was there pursuant to court order – the parking lot was the place ordered by another judge in Berks

County as the location where Kortman and his ex-girlfriend would exchange physical custody of their child. Kortman had either arrived early or his ex-girlfriend was late, as, by 6:30, he had been waiting in the parking lot for 30 – 45 minutes.

West Reading Police Sergeant Keith Phillips had finished his shift and was leaving for the day when he went into the parking lot. N.T. Trial, 11/19-20/2013, at 58.[1] He had noticed Kortman waiting in the parking lot and went over to Kortman's car to see why he was there. *Id*. at 58-60. Sergeant Phillips was not in uniform, but was wearing a polo shirt that had a badge embroidered on it and which had the words "West Reading Police Department" embroidered on the left sleeve. *Id*. at 59. Sergeant Phillips identified himself as a police officer and asked Kortman to identify himself and to tell him why he had been in the parking lot.[2] *Id*. at 61. Kortman declined to answer Sergeant Phillips' questions. *Id*. In his testimony, Sergeant Phillips acknowledged that Kortman was under no obligation to

_____

[1] The notes of testimony are contained in one volume, although the trial took place over two days, November 19 and 20, 2013. Any citation to testimony on or after page 127 was from November 20, 2013.

[2] Although Sergeant Phillips testified he thought Kortman's activity was suspicious, he never claimed to have had a reasonable suspicion of criminal activity.

respond, but the Sergeant called for uniformed police backup in order to compel response.[3] *Id*. at 61-62.

While Sergeant Phillips confronted Kortman, Kortman called 9-1-1 to report that a person claiming to be a police officer, but who would not produce a badge, was harassing him. *See* Transcript of 9-1-1 call. The 9-1-1 operator told Kortman to obtain the person's license plate number.

---

[3] From the direct examination of Sergeant Phillips:

> Q: [A]t that point did Mr. Kortman believe you were a police officer?
>
> A: No, I don't believe so.
>
> Q: So what happened?
>
> A: He refused to talk to me.
>
> Q: What did you do?
>
> A: I said, okay, I'll get some people that you will talk to then. And I went back to my car, and I called for the guys who were on duty to come over and just find out who he was.
>
> Q: Why did you call for officers who were on duty to figure out who the individual was?
>
> A: Well, they're gonna show up in a marked police car and uniform. So sometimes I guess that makes a difference to some people. So I wanted to make sure that that happened.

N.T. Trial, 11/19/2013 at 62-63.

*Id*. Kortman attempted to take a cell phone picture of Sergeant Phillips' pickup truck, but Sergeant Phillips backed up toward Kortman and then left the scene. N.T. Trial, 11/20/2013, at 157.

Almost immediately thereafter, Police Officer Marc Oxenford, in full uniform and driving a marked police car, arrived at the parking lot. *Id*. at 131. No one other than Kortman was there. *Id*. at 129. Officer Oxenford testified he was responding to a report of a fight in progress.[4] *Id*. Officer Oxenford attempted to talk with Kortman to find out why he had called 9-1-1, however, Kortman did not respond because he was still on the phone with 9-1-1. *Id*. at 130. Officer Oxenford's marked vehicle was parked approximately four to five feet in front of Kortman's BMW. *Id*. at 63, 119.

Sergeant Phillips returned to the scene. It is unclear precisely where he parked, but Kortman testified he might have been able to get around the cars. *Id*. at 161. Police Officer Edward DeLozier, Jr., also in full uniform and driving a marked vehicle, arrived in response to Sergeant Phillips' request for backup. *Id*. at 103-104. When Officer DeLozier arrived, he saw what appeared to be a public argument between Kortman and the other two officers. *Id*. at 102. A physical confrontation ensued in which the police officers attempted to get Kortman out of his car and question him. *See id*.,

---

[4] It is unclear who claimed there was a fight in progress. The 9-1-1 transcript of Kortman's call contains no claim of a fight and there are no indications of any other calls to the police.

*generally*. At some point during the argument, Kortman started his car. As the officers attempted to reach into Kortman's car to turn it off, Kortman attempted to put the car into gear. *Id*. at 107. The car lurched forward approximately three feet, and then stalled.[5] *Id*. at 107, 122-23. The movement of the car forced the officers to jump back out of the way to avoid being hit or having their feet run over. *Id*. at 106-107. Officer Oxenford testified that had Kortman been able to get the car fully engaged, "we would have got run over." *Id*. at 147.

Specifically, Officer DeLozier testified as follows:

A: What happened is I told him to get out of the car. He stepped back in the car. He motioned – I don't know if it's a key or push start, but I saw him go towards the steering wheel. I heard the engine start. That was after I told him to get out of the car. I told him to get out of the car again as I stepped in to try to turn off the key to the engine. As I stepped in with my right foot, the car went forward. I jumped back. Officer Oxenford was right behind me, if you will, to my right. And as the car went forward, I jumped back. At that point, I told him he was under arrest, get out of the car.

Q: And where is your body positioned at the precise moment Mr. Kortman's car goes forward?

A: I am stepping into his car. So my right foot is just inside of his car, and I'm moving towards the area where I think that the keys would be.

Q: Where is your right hand?

---

[5] Kortman's car had a manual transmission.

A: It's in front of the steering wheel or moving towards that direction. I don't know how far my hand was. I know I didn't make contact with the keys.

Q: Where is your left hand?

A: To the best of my knowledge, it would be on the – it would be [on] the front quarter panel of the driver's door. So the driver's door is open, and I'm stepping in. I'm left-handed, but I stepped in with my right foot and braced myself with my left arm and tried to reach in with the right arm to grab the keys.

Q: And where is your head at this that point? Is it inside or outside the car?

A: It's partially both, I would say. It's hard to know the exact location. I know I stepped in. And once it moved, I jumped back. I jumped back right away.

Q: How would you best describe the movement of that car?

A: Abrupt, fast, and it scared me. As I stepped in and moved, the car went about 3 feet forward. And I jumped back out of maybe some reaction, but I can also say fear a little bit when that happened.

Q: Why were you afraid?

A: Because he refused to come out. And then when I told him to come out and he starts the car and I tell him to come out again and he refused to do so and I reach in to stop the – to turn the keys off and the car lurches forward, at that point I don't know what Mr. Kortman's capable of because he's not listening to any of my commands and now the car's moving forward.

N.T. Trial, 11/19/2013, at 105-107.

At this point, the officers told Kortman he was under arrest. *Id*. at 108. Officer DeLozier reached into the car to pull Kortman out, but Kortman pulled back and broke free of his grip. *Id*. Kortman reached back to the steering column as if to try to start the car again. *Id*. at 109. Both officers

reached in again, this time pulling Kortman largely out of the car. Kortman put his foot on the ground and braced himself against the officer, who then pulled Kortman to the ground and handcuffed him. *Id*. at 109-110.

Other than admitting that he might have been able to move his car around the police vehicles and leave the scene, Kortman denied all other aspects of the Commonwealth's case. He claimed he fully complied with Sergeant Phillips' request to identify himself, giving the Sergeant his driver's license, registration and insurance card.[6] *Id*. at 163. He stated the car never even lurched because he never turned the car on. *Id*. at 164. He did not describe the amount of force needed to remove him from his car, but claimed the officers used excessive force in subduing him. *Id*. at 166.

Regarding reckless endangerment, based upon the above evidence, the majority concludes "…the car lurched forward by stalling out. This occurs in a manual transmission vehicle when the vehicle is in gear and a person removes his or her foot from the clutch too quickly without pressing the gas pedal adequately. Hence, the evidence establishes that the car

---

[6] This testimony is contradicted by the 9-1-1 call placed by Kortman in which he was adamant he had no idea who the person was who was accosting him. Kortman did not explain why he would produce his driver's license, registration and insurance card to a stranger. Neither did he explain why, having produced his identification, he would then call 9-1-1, reporting he was being accosted by someone claiming to be a police officer.

lurched forward and stalled because Appellant's car was on and in gear and his foot was no longer on the clutch." Majority at 8.

The jury clearly rejected Kortman's testimony that the car never moved because he never turned on the car. Accepting that Kortman started his car and put it into gear, the Commonwealth was entitled to the reasonable inference he meant to drive it. This inference is supportable by the fact his car moved forward. However, having accepted the jury's initial determination, and acknowledging that the Commonwealth is entitled to all reasonable inferences drawn from the facts,[7] the majority improperly rejects that reasonable inference by unilaterally determining that Kortman did not attempt to drive his car. Rather, the majority asserts the explanation for the car moving is that Kortman removed his foot from the clutch, while the car was in gear, allowing the car to stall and lurch forward. This interpretation of the evidence represents improper fact-finding by the majority and is not warranted given our standard of review. *See Commonwealth v. Thompson*, 106 A.3d 742, 756 (Pa. Super. 2014) (Appellate court may not weight the evidence and substitute its judgment for the fact-finder's.)

_____

[7] Majority at 8, citing *Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa. Super. 2013).

The majority determines it was a virtual impossibility for any of the police to be at risk for serious bodily injury because Kortman never attempted to drive his car. Majority at 8-9. The jury was entitled to believe the police officers' testimony and give it whatever weight might be appropriate. By convicting Kortman of REAP, the possibility of serious bodily injury became, essentially, a finding of fact. Considering the testimony and the reasonable inferences drawn therefrom, it cannot be said as a matter of law, the officers were not at risk of suffering serious bodily injury. By disregarding the jury's determination, the majority has substituted its judgment for the fact-finders' and has again engaged in improper fact-finding. ***See Thompson***, ***supra***; ***Commonwealth v. Grant***, 813 A.2d 726, 734 (Pa. 2002) (Appellate courts do not act as fact-finders, since to do so would require an assessment of credibility of the testimony, and that is clearly not the appellate court's finction.)

Having properly determined Kortman put his car in gear and attempted to drive away while Office DeLozier was reaching inside, the jury was allowed to conclude those actions were evidence of Kortman's recklessness. Accordingly, I find that viewing the evidence in the light most favorable to the Commonwealth as verdict winner, as we are required to do, provides sufficient evidence to support Kortman's conviction of REAP.[8]

---

[8] The majority also comments on the likelihood that the encounter between the police officers and Kortman constituted an unlawful investigative
*(Footnote Continued Next Page)*

I also find Kortman's conviction of resisting arrest[9] to be supported by the evidence. Kortman specifically claims there was insufficient evidence to show the police were required to use substantial force to overcome his resistance. I note that the statute does not criminalize all resistance to arrest, rather, only such resistance that requires substantial force to overcome.[10] "Substantial", however, is not defined by statute. Accordingly, looking to the common understanding of the word,[11] substantial is defined as

*(Footnote Continued)* _____

detention. Majority at 10, n.2. I note that at the beginning of the encounter, it is undisputed that Kortman called 9-1-1 and requested police assistance. Whether the encounter was unlawful was never determined because no motion to suppress was filed and the issue was never raised, argued or briefed. We have no knowledge why this issue was unexplored. While Kortman might be entitled to relief on such grounds, that would only be appropriate after the issue had been thoroughly reviewed through a Post-Conviction Relief Act petition.

[9] Resisting arrest is defined as:

> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S. § 5104.

[10] In general, a "minor scuffle" is insufficient to support a charge of resisting arrest. ***Commonwealth v. Rainey***, 426 A.2d 1148, 1150 (Pa. Super. 1981).

[11] ***See*** 1 Pa.C.S. § 1903 (a), which states, in relevant part: "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage."

ample or considerable.  *See* Random House Kernerman Webster's College Dictionary, 2010; American Heritage Dictionary of the English Language, 5th Edition, 2010.

Here, the evidence demonstrated that it took the efforts of two police officers to pry Kortman from his car, take him to the ground, and handcuff him.  The trial court cites Officer DeLozier's testimony on pages 108-110 to support the jury's determination.  In addition to the information cited by the trial court, Officer DeLozier also testified that Kortman attempted to restart his car during this struggle, thereby adding additional danger to the situation.  It must also be remembered that the police officers were attempting to remove Kortman from the close confines of the front seat of an automobile.  The testimony described multiple efforts of two police officers, ultimately requiring Officer DeLozier to grab Kortman by the back of his neck, forcefully pulling him from the car, and then requiring two officers to force Kortman to the ground.

There is no case law describing the efforts to arrest and control an unwilling defendant in close quarters.  However, the force required to overcome passive resistance can be considered substantial.  This Court's decision in *Commonwealth v. Thompson*, 922 A.2d 926 (Pa. Super. 2007), is instructive.

The only evidence cited in *Thompson* to support the use of substantial force was the following:

Officer Ewing testified that she struggled to pull Appellant apart from her husband with whom she had interlocked her arms and legs. Although Officer Canfield verbally commanded Appellant several times to put her hands behind his back, she refused to obey and held her arms tightly beneath him. Officer Canfield testified that his attempts to restrain the couple to place them under arrest left him "exhausted."

*Thompson*, 922 A.2d at 928.[12]

*Thompson* demonstrates that actively fighting a police officer is not required to prove resisting arrest. Accordingly, I believe the jury was entitled to draw the same inferences for the necessity of the use of substantial force herein.

I suggest other cases decided by our Court support the instant verdict. In *Commonwealth v. Wertelet*, 696 A.2d 206 (Pa. Super. 1997), where a squirming and struggling woman who kicked a police officer in the shin, required substantial force to overcome. The *Wertelet* court opined, "Examples of 'means' which would undoubtedly satisfy the Code by requiring substantial force to overcome would be any kind of significant physical resistance, including punching, shoving, *squirming*, biting or kicking." *Id*. at 211 (emphasis added).

_____

[12] I do not believe that "exhausted" is a magic word, demonstrating the necessity of the use of substantial force. Rather, I believe a jury is entitled to look at the totality of the circumstances to draw reasonable conclusions and inferences. In *Thompson*, the jury could well picture the situation and infer the amount of force needed to pry apart the passive resistors.

In **Commonwealth v. Franklin**, 374 A.2d 1360, 1363 (Pa. Super. 1977), a panel of our Court concluded there "can be little doubt" that evidence a woman used loud and abusive language and required three officers to handcuff her, was sufficient to support resisting arrest.[13] In **Commonwealth v. Coleman**, 19 A.3d 1111 (Pa. Super. 2011), a defendant twisted his shoulders such that his shoulders hit a police officer who was trying to take the defendant's hands from his pockets and arrest him. Such action was sufficient to support resisting arrest. In **Commonwealth v. Clark**, 761 A.2d 190 (Pa. Super. 2000), a defendant fled police after being pepper sprayed,[14] but slipped and fell, whereupon a police officer rolled over on the ground with the defendant. This constituted substantial force. Most recently, **Commonwealth v. McDonald**, 17 A.3d 1282 (Pa. Super. 2011), related circumstances almost identical to those found in **Clark**, including the

---

[13] Regarding the use of substantial force, the specific evidence cited in **Franklin** was as follows:

> Another struggle ensued between the officers and the appellant as they attempted to place handcuffs on her and take her out to the patrol car. The officers succeeded in getting one handcuff on the appellant, but were having difficulty securing the other one. Officer Kibler, who was one of the officers in the house at this time, testified that it took three police officers to finally get the handcuffs on the appellant.

**Franklin**, 922 A.2d at 1362.

[14] As stated by the Majority, flight alone does not constitute resisting arrest. **Commonwealth v. Miller**, 475 A.2d 145 (Pa. Super. 1984).

defendant's flight, the defendant slipping and falling, and a tussle on the ground.

In the present case, the jury was properly charged as follows:

A person cannot commit [resisting arrest] unless he or she creates a substantial risk of bodily injury or resists by means justifying or requiring substantial force to overcome his or her resistance. Thus, you cannot find the defendant guilty if you find that he merely scuffled with or argued with the police officer.

N.T. Trial, 11/20/2013, at 205.

I believe the evidence presented instantly is comparable to the evidence cited in the above cases. In light of the this legal precedent, and applying our well established standard of review, I agree with the trial court that the jury could conclude that the effort described in the testimony represented more than a mere scuffle and constituted the use of substantial force. Therefore, I must dissent from the Majority on this issue.

As noted, although I respectfully dissent from the Majority's decision regarding the disposition of the charges on REAP and resisting arrest, I am in full agreement with the Majority regarding the dismissal of the charges of harassment and disorderly conduct.

Accordingly, I concur in part and dissent in part.